The next case for argument is Hudacko v. Regents of the University of California. Hudacko v. Regents of the University of California Good morning to all counsel. Before we get started, let me just note that on the appellee side, there's splitting of time and you'll get your individual clocks. That makes it easier for us and for you to keep track of your time. Thank you. Good morning, Your Honors. Myron Moskovitz for the appellant, Edward Hudacko. And first thing I'd like to do is withdraw the argument that the district court judge, Susan Ilston, was biased and a Holocaust denier. That part of the appellant's opening brief was written by another lawyer who got a bit carried away. And let me just leave it at that. That's an understatement. I mean, that was an outrageous statement, and I'm glad you retracted it. I agree. But it should never have been included in a brief. I speak for myself on this. I totally agree. And that's the first thing I recommended to my client. No, I appreciate that you started your argument saying that because that is completely without foundation. Absolutely. So it's a good way to start the argument. Well, thank you. But I couldn't let that pass. The other thing about the brief is it gets very involved in a culture war between the pro and anti-trans groups, and there's no need for this court to get into that at all. This is a very simple case. It's a case where government doctors sliced open the arm of a teenager to insert drugs that would inhibit his natural development through puberty without the consent of his father. That's what this case is about. And the cases on the rights of parents to control and be involved in their children's upbringing go way back. I sent a letter to the court yesterday with some cases that I'll be mentioning, so I won't bother including the sites. In Troxel v. Granville, the Supreme Court in 2000— Can you counsel clarify and define for me what is the clearly established right that the plaintiff is advancing in this case? The clearly established right is the right not to have your kids sliced open and have drugs inserted into them that will change their development without the parent's consent. So it's a right to make determinations of medical care for minor children? Yeah, yeah. But what about the custody order in this case? Pardon me? What about the custody order in this case? The order from the Contra Costa judge—there were two orders. One gave the UCSF doctors the general power to treat the kid for the trans conversion. I'm talking about the plaintiff's right. So you define the right as the right of a parent to make decisions, medical decisions, for their minor child. Exactly. But the order in this case has the right to weigh in only in the event of surgery, right? So I'm asking you to address the implication of the order on your clearly established right in this case. Here's what the order says. Now, keep in mind, this was a hotly contested divorce, a big fight about custody, which parent had the right to control the minor's medical situation, and the Contra Costa judge gave most of those rights to the mother and not to my client, except one. Except one. The minor child will not be permitted to undergo any gender identity-related surgery until they are 18 years old, absent written agreement by both parties, Christine Underhill and Edward Hidalko. And the UC doctors simply violated that. They simply ignored that, according to the Second Amendment complaint. Well, the argument is that it fell under the prior clause that it was commencing hormone therapy. There's two problems. But, I mean, I think to the broader question, would you agree that a custody order can modify what clearly established rights are? Because you can always waive rights. Yes, I totally agree. So then it comes down to the custody order, correct? The custody order deprived my client of almost all his rights, but not this one. This is a constitutional right that the Contra Costa judge decided not to take away from him. And this is the right that was clearly violated. Now, the UCSF defendants claim that, well, maybe they misread it. Maybe they read the other part of the order, which allows conversion therapy without surgery, as eliminating this order. That's the only way you can say it. If they're right about that, then this part of the order that protects the father's right where there's surgery is gone. So it's a totally unreasonable reading. But there's another problem with it. You don't even have to get to that point. This comes up on a 12B6 motion. The complaint doesn't allege anything about misreading the Contra Costa order. That's a defense, and a defense is for trial. We don't even know if they'll raise that defense. They might not say that. They might testify that we don't care about some state court order. We think this is the right thing to do. We have no idea. This cannot be litigated on the face of the Second Amendment complaint. There's nothing in this, in the Second Amendment complaint, about this. It has to go to trial if that's going to be their defense, and we really don't know if it will be their defense. Can you briefly address the cases against Harkins and Bigger? I have a hard time seeing how they can be de facto state actors. Your Honor, we'll submit that on the brief. I think the case against the doctors is much stronger, obviously, because they're the ones that took out the knife and cut the kid's arm open. These other people didn't. But we'll submit that on the brief. Are you still contending that they're state actors, and if so— Pardon me? Are you still contending they're state actors? Yeah, they were state actors. And tell me why. But I'm not going to use my limited time pressing that point. The most guilty people— Well, I think you should answer the question if Judge Thomas is asking it. Well, according to the allegations of the Second Amendment of the complaint, there was a type of conspiracy here among all of them, and Harkins and the others were involved in that. And, yes, they too are liable. That's my answer. Well, the conspiracy has to be with another state actor. Who is that? The doctors. I'm sorry? The doctors. The doctors, the defense lawyer, all these people were involved in making the cutting open of the boy without the father's consent happen. But, as I said, I'm going to focus on the most guilty parties here, and that was the doctors. I mean, any claim that this wasn't a clearly established constitutional right is rebutted by— This Court's own decisions in Drummond v. City of Anaheim, it is not necessary that the alleged acts have been previously held unconstitutional so long as the unlawfulness was apparent in light of existing law. Well, the existing law was right in front of their faces from this Contra Costa Court. Is that a State law right then? I mean, you would be claiming a clearly established contract right. That's not a clearly established constitutional right.  Drummond and the other cases about this are typically about constitutional law, not about interpreting some State court order. But in both ways, it's obvious. You know, there was a case that came down, Taylor v. Riojas, from U.S. Supreme Court. It's cited in our letter, 2020 case, where the defendant alleged that he was a prisoner kept in a cell that was freezing, that was full of excrement, and he was kept there for a length of time. And the defendant said, well, there's no prior case involving those facts. And the Supreme Court said, that's not the way you do it. That's not the way you do it. There doesn't have to be an exact case. When the government defendants do something outrageous like they did in that case, then they should know better. It's exactly the same thing here. They knew that the complaint alleges that they knew about this order, that they weren't supposed to cut the kid open, they weren't supposed to insert these drugs without the father's consent. And they did it anyway. And the cases involving the rights of parents involve rights that are not as important as this. It really comes down to that. They're about raising the kid. There is one case, Parham v. J.R., where the court did allude to tonsillectomy, appendectomy, and other medical procedures. I guess the question, I mean, here there's a disagreement among the parents. And does that not affect the analysis of whether the right was clearly established? It's one thing to say a parent has a right to oversee the medical treatment of their child, but it's a different thing to say that they may have that right in the face of a state court order that plainly takes away some amount of the parent's control. I don't understand that, Your Honor. Yes, the state court order took away a lot of Mr. Hidako's rights, but it left this one, this constitutional right to object to surgery on his kid and insertion of drugs that would inhibit his development. It left that one. That is a constitutional right. It's not a right to ---- It left the decision as to whether to commence hormone therapy solely in the hands of the mother, right? Under the custody order. Yes, unless there's surgery. Unless there's surgery. That's the difference. Taking a knife and cutting the kid open. The Contra Costa judge said, when it goes that far, you're going to have to get the consent of the father. And they didn't do it. I mean, to me, it's outrageous. When I first picked up this case, my first thought went to my own son. I have a 14-year-old boy, and he's just started high school. And the idea that some government doctor on his own would cut open his arm, he's an accomplished tennis player, by the way, and insert some drugs that would stifle his growth in some way, he's a head taller than me and still growing, it's appalling. I can't think of a worse thing the government could do. Do that without my involvement, without my consent. I'm the one that raised him since birth. And to me it's obvious. If it was obvious to the Supreme Court you can't stick a guy in a cell full of excrement and freezing for several days, this is obvious too. I mean, the cases that go all the way back, the court said the liberty interest in this case, the interest of the parents in care, custody, control of their children, is perhaps the oldest of the fundamental liberty interests recognized by this court. That was in Troxell v. Granville. I mean, you look at a case like West Virginia v. Barnett. It's an interesting comparison, 1943 case. And the parents were Jehovah's Witnesses who objected to the state requiring their kids to pledge allegiance to the flag, because the Jehovah's Witnesses felt that was in violation of the Bible's prescription against bowing to craven avengers. All right? And the Supreme Court ruled for the parents. Now, think about that a minute. I hate to cut you off, but I just want to remind you that you wanted to save a little bit of time. I do.  I'll come back later. Good morning, Your Honors, and may it please the Court. Robert Dado for the U.C. Regents Defendants. We agree with the general proposition here that it all comes down to this custody because that defines, by Mr. Hudako's own complaint, what this alleged constitutional right is. On the one hand, you've got paragraph 7a that says hormone therapy is permitted. You have 7b that says Mr. Hudako can still veto gender identity-related surgery. How do you read those two provisions together so that both of them have meaning? Here's how. It can't mean what Mr. Hudako says it means. What it has to mean is gender identity-related surgery means permanent physical changes. If that's what that means, then both of these provisions make sense. You can go ahead and do the hormone therapy. That obviously was a vigorously contested issue in the state court. The state court ruled as it did. What Mr. Hudako is saying is, oh, no, you can have hormone therapy, you just can't deliver it through an implant because, pursuant to Mr. Hudako's own complaint, there are three ways to deliver the same hormone. Injections, pills, implant. So what his theory is is, oh, no, what the state court said is you can't give hormone therapy through an implant. There is nothing in that custody order that would support that construction of the order. That doesn't make any sense. What the court was doing is it was separating it into two piles, basically. One is therapy, one is permanent surgery. That makes sense from a state court custody order perspective. What about the allegation that it was billed as surgery? It's not a problem. I understand it. That's what it says. That's fine. But it doesn't make any difference here because, again, you're trying to reconcile, you're trying to harmonize two provisions of a state court order, and that is the interpretation that makes sense. But even if that is wrong, it is certainly, as Judge Ilston found, a plausible interpretation of this order. And if it's a plausible interpretation of the order, then you certainly have no clearly established constitutional right based on it. And so that's why the qualified immunity ruling must stand, and it must stand on a 12b-6 motion. It's the perfect case for a 12b-6 motion because, again, it does all come down to that custody order. That's what defines, under his own allegations, the alleged right in this case. Well, he's trying to use cases like Parham-Troxell to define it at a much higher level, which is the right of parents to make medical decisions.  But you're saying that's too high of a level of generality.  Correct. As we've contended in the briefs, that's far too high a level. What is required here is any reasonable doctor that read this order would absolutely know that he couldn't do hormone therapy through an implant. That's the only way Mr. Thomas is wrong. So there can't possibly be a clearly established constitutional right based on the facts of this case because his rights were so limited by this State court order. That, again, is beyond the Federal court's purview by Rooker-Feldman. So that's what sets the stage here. It is just, Judge Thomas, all about the custody order. What about the intentional infliction claim, which doesn't have some of the same clearly established law overhang? And sure. There are some distinctions. I agree with you, Judge Press. They do. But, again, one has to look at, first of all, how can it be outrageous conduct to follow the dictates of a court order? That's simply not outrageous conduct. But more to the point, Mr. Hudako never alleges that this form of delivery of hormone therapy was what caused him harm. It's all about hormone therapy in general, and we all know he's very opposed to that. But that's what his allegation is. It's not that this particular delivery system caused it. It's hormones in general. Or hormones in general. That therapy was allowed by the state court. That can't be outrageous conduct. It's a matter of law. I think his argument is this was surgery, and surgery is broader than the way you've defined it. Maybe not clearly established, but his position would be it is. And there was a, you know, it's not like taking a pill. There was something more invasive that happened here, and it was billed as surgery. So it's at least a factual question. No, because, again, he doesn't tie any of that. First of all, that's not in his complaint in terms of there's a difference in the delivery system. That's nowhere in his complaint. That can't even be inferred from his complaint. He never made this distinction in his complaint. He just said it's surgery and it's prohibited. But it has to be viewed in the context of what was permitted under the state court order. Hormone therapy was, so that can't be it. It's got to be something more. And he doesn't have anything more in his complaint, and nothing from which you can infer anything more. And on that basis, 12b-6 on the intentional infliction was properly, properly sustained. I've got other time. I've got other points I can make, but those are the ones that dictate this case, Your Honors. I think we've got the argument. Let me see if my colleagues have additional questions. It doesn't appear that we do. Thank you, counsel. All right. Thank you. Mr. Wilson, just a minute. There are others. Counsel had split their time, so I have Mr. Wilson and Ms. Hanson left to argue. Good morning, Your Honors. Mark Wilson for the appellee, Daniel Harkins. I'm going to be brief, partially because I have to be. The claims against my client hinge solely on whether or not he was a State actor. Obviously, he was a private individual, not like the Regents. Judge Ilston correctly determined that the allegations in the complaint, the factual allegations of the complaint, did not even give rise to an inference that he was a State actor based on what Mr. Moskowitz has said is, and Mr. Moskowitz submitted on the briefs, and all that Mr. Moskowitz could say is that it was some type of conspiracy. And as Judge Ilston correctly found, there is not enough factual information in the complaint to support a finding of a meeting of the minds between my client and any of the State actor such that he can be liable under Section 1983. And unless there are any questions about that, I will submit. Thank you. Ms. Hanson? You're not up yet. Just a minute, Mr. Moskowitz. Good morning, Your Honors. Lisa Hanson for appellee, Nathaniel Bigger. As the Court's well aware, Mr. Bigger is a private attorney. He was Appellant's ex-wife. The case against Mr. Bigger is even tougher than Harkin's. It is, Your Honor. And I think Appellant's counsel's, I'm going to call it a concession, that there's nothing further than what's in the briefs and submitted on the briefs as to Mr. Bigger is quite telling. And the reality of this is the allegations in the second minute complaint did not, as the U.S. Supreme Court has said, cross the line from the conceivable to the plausible. Is Ms. Underhill still involved? Nobody represents her here, but is she an appellee in this case? Your Honor, I believe that she is. I do not believe she has counsel for the appeal. I do not represent Ms. Underhill. I only represent Mr. Bigger for purposes of the appeal. And, of course, Mr. Bigger is not a state actor. He was communicating with his client, Ms. Underhill. And with that, Your Honors, unless the Court has any questions, I would submit. Thank you, counsel. All right, Mr. Moskowitz. The only facts this Court has before it are those alleged in the second amendment complaint. You've got nothing else. There's been no discovery. There's been no trial. I don't even think there was an answer. So when counsel gets up here and say, here's what these doctors did. They read that order this way and not that way. Where does that come from other than the imagination of counsel? There's no testimony. There's no evidence of that. It might have happened. If a doctor gets on the stand and testifies the way he said, we're going to ask for an order from the trial court interpreting the document. The specific controls the general. It's a standard rule of contract interpretation. There's one provision about surgery. That controls over the general ones over the other ones. Okay? But it doesn't matter. At this point in the litigation, for all we know, a doctor is going to get up and testify, I don't care anything about those Contra Costa orders. I believe in conversion surgery, and I'm going to do it anyway. That could happen or it could not happen. We have no idea. All right. Thank you, counsel. Okay. Thank you to all counsel. We appreciate your argument this morning. The matter is submitted.
judges: THOMAS, NGUYEN, BRESS